**B.L. KEY, INCORPORATED,**
Petitioner and Appellant,

v.

**UTAH STATE TAX COMMISSION,**
Auditing Division, Respondent
and Appellee.

No. 960793–CA.

Court of Appeals of Utah.

March 13, 1997.

Randy M. Grimshaw and Maxwell A. Miller, Salt Lake City, for Petitioner and Appellant.

Jan Graham and Gale Francis, Salt Lake City, for Respondent and Appellee.

Before DAVIS, BENCH and BILLINGS, JJ.

## OPINION

BENCH, Judge:

Petitioner B.L. Key, Inc. seeks review of the Utah State Tax Commission's order denying its petition for redetermination of a statutory notice assessing a sales and use tax deficiency. Specifically, petitioner contends that it is not required to collect and remit sales and use taxes in Utah. Because the Commission properly concluded that petitioner "regularly engaged" in the delivery and servicing of property, Utah Code Ann. § 59–12–107(1)(a)(iv), (v) (1996), we affirm.

## BACKGROUND

Petitioner is an Oklahoma corporation that produces concrete weights and coatings for underground pipelines. In 1991, it entered into agreements with four contractors to manufacture weights and coatings for a natural gas pipeline under construction in Utah. Over a period of about eight months, petitioner sent three supervisors on approximately eight trips to Utah to oversee the production of the weights and coatings. Although each supervisor's trip to Utah lasted

an average of one week, two trips lasted slightly less than fourteen days, and another trip lasted about thirty days. The supervisors traveled to four different locations throughout the state.

Petitioner manufactured the pipeline weights and coatings in Utah. It bought ready-mix concrete from several Utah suppliers and typically constructed the weights and coatings on the property of the concrete supplier. At each location, the supervisors hired at least four local workers to pour the concrete into prefabricated forms. Petitioner paid withholding taxes and workers' compensation premiums on its local workers. After the pouring was completed, an inspector examined the finished products. When the inspector had approved the weights or coatings, title to the finished products passed to the contractor, who then transported the products to the pipeline construction site for installation. Petitioner was paid over one million dollars for services rendered to the four contractors.

In 1994, the Auditing Division of the Commission sent petitioner a statutory notice assessing $68,873.22 in unpaid sales and use taxes. Petitioner sought a redetermination of the statutory notice, arguing that it is not required to collect and remit sales and use taxes under Utah Code Ann. § 59–12–107(1)(a) (1996). Following a formal hearing before an Administrative Law Judge, the Commission denied the petition, concluding that, under section 59–12–107(1)(a)(i), (iv), and (v), petitioner "operated a service enterprise," "engaged in the delivery of property in this state other than by common carrier or United States mail," and "regularly engaged in the servicing of property located within this state." On appeal, petitioner challenges the Commission's interpretation of section 59–12–107(1)(a).

## STANDARD OF REVIEW

On our review of the Commission's formal adjudicative proceedings, we "grant the commission no deference concerning its conclusions of law, applying a correction of error standard, unless there is an explicit grant of discretion contained in a statute at issue." Utah Code Ann. § 59–1–610(1)(b) (1996); *see*

*also Cache County v. Utah State Tax Comm'n,* 922 P.2d 758, 763 (Utah 1996). In the instant case, the statute at issue does not provide an explicit grant of discretion to the Commission. Therefore, we review the Commission's conclusions of law for correctness. *See Beaver County v. Utah State Tax Comm'n,* 916 P.2d 344, 351 (Utah 1996).

## ANALYSIS

Section 59–12–107 sets forth the criteria for determining a vendor's obligation to collect and remit sales and use taxes in Utah. The statute provides, in relevant part, as follows:

(1)(a) Each vendor shall pay or collect and remit the sales and use taxes imposed by this chapter if within this state the vendor:

(i) has or utilizes an office, distribution house, sales house, warehouse, service enterprise, or other place of business;

(ii) maintains a stock of goods;

(iii) engages in regular or systematic solicitation of sale of tangible personal property, whether or not accepted in this state, by the distribution of catalogs, periodicals, advertising flyers, or other advertising by means of print, radio, or television, or by mail, telegraphy, telephone, computer data base, optic, microwave, or other communication system for the purpose of selling, at retail, tangible personal property;

(iv) regularly engages in the delivery of property in this state other than by common carrier or United States mail; or

(v) regularly engages in any activity in connection with the leasing or servicing of property located within this state.

Utah Code Ann. § 59–12–107(1)(a) (1996). If a vendor doing business in Utah meets any of the above conditions, it must collect and remit sales and use taxes. *Id.* If the vendor does not meet any of the conditions, the "person storing, using, or consuming tangible personal property is responsible for remitting the use tax." *Id.* § 59–12–107(1)(b).

On appeal, petitioner does not dispute that it is a "vendor," as defined in Utah Code Ann. § 59–12–102(27)(a) (1996). In addition,

petitioner concedes that the transactions are taxable. It argues, however, that it is not the party responsible for collecting and remitting the sales and use taxes. Therefore, the sole issue before us is whether any of the conditions of section 59–12–107(1)(a) require petitioner to collect and remit sales and use taxes in Utah. Because we agree with the Commission that section 59–12–107(1)(a)(iv) and (v) require petitioner to collect and remit sales and use taxes in this state, we do not address the other conditions of section 59–12–107(1)(a).

A vendor must collect and remit sales and use taxes if it "regularly engages in the delivery of property" in Utah by means other than common carrier or United States mail, Utah Code Ann. § 59–12–107(1)(a)(iv) (1996), or "regularly engages" in the servicing of property, *id.* § 59–12–107(1)(a)(v). On appeal, petitioner concedes that it engaged in the delivery or servicing of property in Utah, but argues that it did not "regularly" engage in those activities. We therefore address the narrow issue regarding the proper interpretation of "regularly engaged" under the statute.

We interpret a statutory term "according to its usually accepted meaning, where the ordinary meaning of the term results in an application that is neither unreasonably confused, inoperable, nor in blatant contradiction of the express purpose of the statute." *Morton Int'l, Inc. v. Auditing Div. of Utah State Tax Comm'n,* 814 P.2d 581, 590 (Utah 1991) (footnote omitted). We consult other methods of statutory interpretation only if we conclude that the language is ambiguous. *US Xpress v. Utah State Tax Comm'n,* 886 P.2d 1115, 1117 (Utah.Ct.App. 1994). Statutory language is ambiguous if it can reasonably be understood to have more than one meaning. *Miller Welding Supply, Inc. v. Utah State Tax Comm'n,* 860 P.2d 361, 362 (Utah.Ct.App.1993), *cert. denied,* 870 P.2d 957 (Utah 1994).

The Commission found, among other facts, that petitioner's "field work in connection with the Utah pipeline project was accomplished on an intermittent and sporadic basis during a period of not more than eight (8) months." Petitioner argues that, as a matter of law, "intermittent and sporadic" cannot be the same as "regularly." It contends that "regularly" means "at predictable or uniform intervals." The Commission, on the other hand, contends that, as used in the statute, "regularly" refers to the vendor's "repetition of services," or level of presence, within the state.

As petitioner has argued, regularly may be defined as "in a regular, orderly, ... or methodical way." *Webster's Third New Int'l Dictionary* 1913 (1986); *see also Burkhart v. Farmers Ins. Co.,* 144 Or.App. 594, 927 P.2d 1111, 1112–13 (1996) (noting that regularly can mean " 'permanent as opposed to off and on, temporary, erratic, and following no pattern' " (citation omitted)). The word, however, may have other meanings as well. In *Youth Tennis Foundation v. Utah State Tax Commission,* 554 P.2d 220 (Utah 1976), the Utah Supreme Court considered the meaning of "regular activities," as used in the statute providing sales tax exemptions for the regular activities of charitable groups. *Id.* at 223. The supreme court noted that "something can be done 'regularly' if done whenever the opportunity arises, though the actual time sequence may be sporadic." *Id.* The supreme court concluded that, even though the activity at issue "occurred at intermittent times, it was part of [plaintiff's] 'regular activities.' " *Id.* Similarly, in *Monaco v. Montgomery Cab Co.,* 417 Pa. 135, 208 A.2d 252 (1965), the court concluded that, under the venue rule at issue, regularly does not necessarily mean "fixed schedule," but refers to acts that "are being 'regularly' performed within the context of the particular business." *Id.* 208 A.2d at 256. Finally, in *State v. Houston Tour & Charter Service, Inc.,* 460 S.W.2d 113 (Tex.1970), the court observed that regularly, as used in the transportation statute under consideration, does "not carry the connotation of fixed or regular route operations." *Id.* at 116.

Because regularly may reasonably be understood to have more than one meaning, the term is ambiguous. *See Miller Welding,* 860 P.2d at 362–63. We therefore "turn to legislative intent to determine its meaning" within the context of the statute. *Id.* at 363; *see also Hansen v. Salt Lake County,* 794 P.2d

838, 841 (Utah 1990) ("When interpreting an ambiguous statute, we first try to discover the underlying intent of the legislature, guided by the meaning and purpose of the statute as a whole and the legislative history.").

The Utah Legislature enacted the statute at issue in 1981. *See* Sales and Use Tax Jurisdiction Standard, ch. 240, § 1, 1981 Utah Laws 1187 (then codified at Utah Code Ann. § 59–15–5 (Supp.1981)). The language of the statute was taken verbatim from the Sales and Use Tax Jurisdiction Standard (the Standard) adopted by the Multistate Tax Commission (MTC). *See* Recording of Utah House Floor Proceedings (S.B.157), 44th Legislature, General Session (February 25, 1981) (statement of Rep. Knowlton); Recording of Utah Senate Floor Proceedings (S.B. 157), 44th Legislature, General Session (February 20, 1981) (statement of Sen. Bullen). The MTC had adopted the Standard shortly after the United States Supreme Court's decision in *National Bellas Hess, Inc. v. Department of Revenue*, 386 U.S. 753, 87 S.Ct. 1389, 18 L.Ed.2d 505 (1967), *overruled in part by Quill Corp. v. North Dakota*, 504 U.S. 298, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992). *See Resolution by the Multistate Tax Commission Regarding Withdrawal of Sales and Use Tax Jurisdiction Standard* (Adopted July 13, 1984, in Annual Meeting, Denver, Colorado) (discussing 1968 adoption of the Standard).

In *Bellas Hess*, the Court held that, under the Due Process and Commerce Clauses, the State of Illinois could not impose use tax collection duties on a mail order business that communicated with customers in Illinois only by mail or common carrier. 386 U.S. at 756–58, 87 S.Ct. at 1391–92. The Court re-fused to "obliterate" the recognized distinction between businesses with "retail outlets, solicitors, or property within a State" and those with no physical presence in a state. *Id.* at 758, 87 S.Ct. at 1392. Therefore, the Court concluded that a business must be physically present in the taxing state to justify the imposition of tax collection duties. *Id.* The Court, however, did not say what level of physical presence would justify the imposition of tax collection duties, leaving that determination to be made on a case-by-case basis.[1] *See generally* David F. Shores, *State Taxation of Interstate Commerce: Quill, Allied Signal and a Proposal*, 72 Neb.L.Rev. 682, 696 (1993).

As adopted by the Utah Legislature, the Standard reflected the "physical presence" language of *Bellas Hess*. In *Bellas Hess*, for example, the Court noted that the appellant " 'does not maintain in Illinois any office, distribution house, sales house, warehouse or any other place of business,' " and that all its contacts with the state "are via the United States mail or common carrier." 386 U.S. at 754, 87 S.Ct. at 1390 (citation omitted). Similarly, the Standard imposed sales and use tax collection duties on a vendor that "has or utilizes an office, distribution house, sales house, warehouse, service enterprise, or other place of business" or "regularly engages in the delivery of property in this state other than by common carrier or United States mail." Utah Code Ann. § 59–12–107(1)(a)(i), (iv) (1996). Therefore, like *Bellas Hess*, the Standard focused on the vendor's physical presence within the taxing state.

The legislative history of section 59–12–107(1)(a) confirms that, in adopting the Stan-

---

1. In *Quill Corp. v. North Dakota*, 504 U.S. 298, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992), the Supreme Court reversed the due process holding of *Bellas Hess*, concluding that "[t]he requirements of due process are met irrespective of a corporation's lack of physical presence in the taxing State." *Id.* at 308, 112 S.Ct. at 1911. The Court, however, declined to reject *Bellas Hess*'s "bright-line, physical-presence requirement" for purposes of Commerce Clause analysis. *Id.* at 317, 112 S.Ct. at 1916. Although the Supreme Court noted that a business's "slight" presence in the state would not suffice, *id.* at 315 n. 8, 112 S.Ct. at 1914 n. 8, courts have refused to interpret *Quill* as requiring a "substantial presence" in the state to impose tax collection duties. *See, e.g., Brown's Furniture, Inc. v. Wagner*, 171 Ill.2d 410, 216 Ill.Dec. 537, 544–45, 665 N.E.2d 795, 802–03 , *cert. denied*, —— U.S. ——, 117 S.Ct. 175, 136 L.Ed.2d 116 (1996); *Orvis Co. v. Tax Appeals Tribunal*, 86 N.Y.2d 165, 630 N.Y.S.2d 680, 686–88, 654 N.E.2d 954, 960–61 (noting that *Quill*'s physical presence requirement may be met "by the presence in the taxing State of the vendor's property or the conduct of economic activities in the taxing State performed by the vendor's personnel or on its behalf"), *cert. denied*, —— U.S. ——, 116 S.Ct. 518, 133 L.Ed.2d 426 (1995).

dard, the Utah Legislature intended that the statute include vendors that repeatedly engage in certain types of business within the state. Senator Bullen, one of the bill's sponsors, explained that the bill encompasses vendors that have previously avoided tax collection duties because they are not permanently present in the state. Recording of Utah Senate Floor Proceedings (S.B.157), 44th Legislature, General Session (February 20, 1981). Specifically, he explained that these out-of-state vendors had asserted that "because we don't have a place of business in the state, and because we don't have a stock of goods in the state, we aren't doing business in the state." *Id.* He described the effort to collect sales and use taxes from these out-of-state vendors as "an issue that's been annoying to say the least," and asserted that the bill "clarifies" that issue. *Id.* Therefore, the legislative history reflects an intent to impose tax collection duties on vendors that conduct a considerable amount of business in Utah, although they may not have a permanent physical presence in this state.

■ In light of the legislative history, we cannot conclude that the legislature intended section 59–12–107(1)(a)(iv) and (v) to encompass only those vendors that deliver or service property in Utah at "uniform or predictable intervals," as petitioner has argued. Our adoption of petitioner's definition would prevent the Commission from collecting sales and use taxes from those vendors that, although present in Utah only on a sporadic basis, engage in a considerable amount of business in this state over a period of time. We conclude that petitioner's narrow interpretation of "regularly" contradicts the purpose of the statute, as expressed by the legislative history.[2] *See Morton Int'l, Inc.,* 814 P.2d at 590; *see also State ex rel. E.K. v. State,* 913 P.2d 771, 773 (Utah.Ct.App.1996) (concluding appellant's "narrow reading" of

statute "is contrary to its legislative intent and defeats the purpose" of statute). We hold therefore that the term "regularly engages" in section 59–12–107(1)(a)(iv) and (v) refers to the vendor's repetition of delivery or servicing and leasing of property in Utah, including the extent of its in-state business activities, rather than to the fixed or predictable occurrence of those business activities in this state.

■ We now consider the facts of this case against the preceding legal standard. Petitioner provided services for four different contractors engaged in the Utah pipeline project. In its agreement with one of these contractors, petitioner specifically assumed responsibility for any sales or use taxes. Over an eight-month period, petitioner sent three supervisors on about eight trips to four locations throughout Utah. The "intermittent and sporadic" character of these trips resulted from the somewhat unpredictable nature of petitioner's business. James McGill, petitioner's CEO, testified that "[w]hen these contractors start opening up bids and laying pipe, if they find water, they call us and we rush out and provide the products that they need; and then leave and wait until they find another problem." Therefore, as its services were required by the contractors, petitioner sent supervisors to Utah to oversee the production of the weights and coatings. *Cf. Youth Tennis Found. v. Utah State Tax Comm'n,* 554 P.2d 220, 223 (Utah 1976) (noting that plaintiff's activities occurred "as the opportunity arose, . . . and even though this occurred at intermittent times, it was part of its 'regular activities' in that sense").

The employees' average stay in Utah lasted one week; however, two trips lasted slightly less than fourteen days, and another trip lasted about thirty days. Therefore, in the aggregate, petitioner was present in

---

**2.** Petitioner argues that, because tax statutes are strictly construed in favor of the taxpayer, we should adopt a narrow definition. *See Belnorth Petroleum Corp. v. Utah State Tax Comm'n,* 845 P.2d 266, 270 n. 8 (Utah.Ct.App.), *cert. denied,* 859 P.2d 585 (Utah 1993). We note, however, that "the vendor's status [under the sales tax statute] is that of a collector rather than that of a taxpayer, although he may absorb from his side of the deal the tax levied upon the sale made by

him." *Bird & Jex Co. v. Anderson Motor Co.,* 92 Utah 493, 498, 69 P.2d 510, 512–13 (1937). In any event, we must also consider "the overarching principle, applicable to all statutes, that [statutes] should be construed and applied in accordance with the intent of the Legislature and the purpose sought to be accomplished." *Parson Asphalt Prods., Inc. v. Utah State Tax Comm'n,* 617 P.2d 397, 398 (Utah 1980) (footnote omitted).

Utah for about half of the eight-month period that it worked for the contractors. While in Utah, petitioner set up temporary manufacturing facilities on the property of local concrete suppliers. At each of four different locations, the supervisors hired at least four, and, as James McGill testified, as many as twelve, local workers to pour concrete. Petitioner paid withholding taxes and workers' compensation premiums on its local workers. It provided over one million dollars in services related to the Utah pipeline project.

We conclude that petitioner's repeated trips to Utah, together with its significant business activities in this state, constitute regularly engaging in the delivery or servicing of property. Therefore, under section 59–12–107(1)(a)(iv) and (v), petitioner was required to collect and remit sales and use taxes in Utah.

## CONCLUSION

The Commission properly concluded that, under section 59–12–107(1)(a)(iv) and (v), petitioner is a vendor required to collect and remit Utah sales and use taxes. We therefore affirm the Commission's order denying the petition for redetermination.

DAVIS, P.J., and BILLINGS, J., concur.